## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MAIN STREET AMERICA ASSURANCE COMPANY, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:18-CV-2073 (JCH) |
| | : | |
| v. | : | |
| | : | |
| VINCENT SAVALLE and | : | JANUARY 5, 2022 |
| LEE WINAKOR, | : | |
| Defendants. | : | |

**RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 105)**

## I.      INTRODUCTION

Plaintiff Main Street America Assurance Company ("Main Street") brings this action against defendants Vincent Savalle ("Savalle") and Lee Winakor ("Winakor"), seeking a declaratory judgment that it is not obligated to defend or indemnify defendant Savalle in a state court action for damages brought by defendant Winakor.  Defendant Savalle asserts a counterclaim against Main Street, alleging that it "is liable to [him] for his costs of defense and at least the covered portion of any damages that survive" the pending appeal of the state court case.  See Def. Savalle's Am. Answer, Special Defense, and Countercl. ("Def.'s Answer") (Doc. No. 27) at 6.

Following discovery and an interlocutory appeal, Main Street has moved for summary judgment "on its claims as set out in its First Amended Complaint [ ] and the counterclaim filed by [Savalle]."  Pl.'s Mot. For Summ. J. (Doc. No. 105) at 1; see also Pl.'s Mem. in Supp. of Mot. For Summ. J. ("Pl.'s Mem.") (Doc. No. 106); Pl.'s Reply to Opp'n to Mot. for Summ. J. ("Pl.'s Reply") (Doc. No. 112).  Savalle opposes that Motion, and Winakor has not responded to it.  See Def. Savalle's Mem. in Opp'n to Summ. J. ("Def.'s Mem.") (Doc. No. 110).

1

For the reasons set forth below, the Motion for Summary Judgment is granted as to Counts Five and Six of Main Street's First Amended Complaint ("Complaint") (Doc. No. 19), and as to Savalle's counterclaim.  Counts One, Two, Three, and Four of Main Street's Complaint are dismissed as moot.

## II.     FACTS[1]

Plaintiff Main Street first issued defendant Savalle businessowners insurance for the policy period of March 9, 2013, through March 9, 2014.  Pl.'s Local R. 56(a)1 Statement of Undisputed Material Facts ("Pl.'s R. 56(a)1 Stmt") (Doc. No. 107) at ¶ 1; Def.'s Local R. 56(a)2 Stmt of Facts in Opp'n to Summ. J. ("Def.'s R. 56(a)2 Stmt") at ¶ 1.  Savalle continued to be insured through Main Street for successive policy periods running through March 9, 2017 to March 9, 2018.  Id.  He obtained this insurance through the Charles G. Marcus Agency, Inc. ("Marcus"), an insurance agent.  Def.'s Additional Material Facts at ¶ 1; Aff. Of Teri J. Davis (Doc. No. 110-1) at ¶ 4.  The insurance contract reads, in relevant part:

### E. Liability And Medical Expenses General Conditions

. . .

### 2. Duties In The Event of Occurrence, Offense, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

---

[1] In summarizing the material facts, the court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits.  Where the parties disagree about what occurred, the court notes the dispute but construes the facts in the light most favorable to the non-moving defendants.

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and[2]

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summons or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

---

[2] Both parties appear to have misquoted the text of Section II.E.2.b.1 of the contract. Citing to what appears to be page 59 of its Exhibit A, Main Street represents that Section II.E.2.b.1 states: "Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" See Pl.'s R. 56(a)1 Stmt at ¶ 2. Savalle admits this as a fact in his Rule 56(a)2 Statement. See Def.'s R. 56(a)2 Stmt at ¶ 2. The insurance contract at this section, however, states: "Immediately record the specifics of the claim or 'suit' and the date received." See Def.'s Ex. A, Main Street America Assurance Company Policy Number MPJ1844M3 ("Insurance Policy") (Doc. No. 106-1) at 59. This exact same language is used in the policies for the successive years in which Savalle was covered. See id. at 186, 322, 460, 608.

Instead, it is Section II.E.2.c.1 that uses the language Main Street has represented is in Section II.E.2.b.1. Because this appears to be an accidental error, and defendants do not appear to have been mislead, the court uses the correct section and language here.

> **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

Pl.'s R. 56(a)1 Stmt at ¶ 2; Def.'s R. 56(a)2 Stmt at ¶ 2; Insurance Policy at 59, 186, 322, 460, 608.  The policy defines the terms "we", "us", and "our", as "the Company providing this insurance."  Insurance Policy at 48.

In September 2012, Savalle began site work on the property of defendant Winakor.  Def.'s Ex. C, Dep. of Lee Winakor (Doc. No. 106-3) at 19.  He continued work on Winakor's house until April 2014, when he was fired from the job. Pl.'s R. 56(a)1 Stmt at ¶ 3; Def.'s R. 56(a)2 Stmt at ¶ 3.  Six months later, in October 2014, Savalle received a demand letter from Winakor's attorney regarding the work he had performed at the site.  Pl.'s R. 56(a)1 Stmt at ¶ 4; Def.'s R. 56(a)2 Stmt at ¶ 4.[3]  Teri Davis, Savalle's girlfriend who helped him with his insurance coverage and other aspects of his business, testified that she "took [the letter] as a threat to sue."  Def.'s Ex. E, Dep. of Vincent Savalle (Doc. No. 106-5) at 16-21; Def.'s Ex. D, Dep. of Teri Davis (Doc. No.

---

[3] The October 2014 demand letter is not in the record.  Savalle has represented that neither he nor the attorney who represented him at the time retained a copy of it.  Def.'s Mem. at 8.  However, because defendant Winakor, through his attorney, sent the letter to Savalle, and Main Street did not seek that letter from Winakor in discovery, Savalle now objects to the use of either his or Davis' testimony regarding the contents of that letter based on the best evidence rule.  See Def.'s R. 56(a)2 Stmt at ¶ 4; Def.'s Mem. at 8-9 (arguing that "[s]ince it was Winakor who had (or had not) directed a lawyer to write to Savalle, Main Street had the right, and as of August 2019 still had the opportunity, to obtain from him the identity of that lawyer – and a copy of the letter.  Having failed to do that, Main Street should not now be allowed to rely on the letter's conjectural contents").  Savalle does not, however, dispute the existence of the October 2014 demand letter.  See Def.'s Mem. at 8 ("Savalle testified . . . that he had received a letter from a lawyer purporting to represent Winakor and had taken it to a lawyer of his own, named Rothstein").

Savalle cites no case law in support of his argument, id. at 8-9, nor does Main Street respond to it in its Reply.  See Pl.'s Reply.  As such, there is a disputed evidentiary question as to the admissibility of the testimony of Savalle and Davis related to the content of the October 2014 letter.  Because it is not necessary to resolve this issue to rule on the pending Motion, see infra n. 10, the court declines to do so.  However, it notes that the testimony in question regarding the letter would likely be admissible as evidence of "the declarant's then-existing state of mind."  See Fed. R. Evid. 803(3).

106-4) at 51.  Savalle and Davis then consulted with an attorney regarding the letter.
Pl.'s R. 56(a)1 Stmt at ¶ 5; Def.'s R. 56(a)2 Stmt at ¶ 5.

Two months later, another demand letter arrived.  This time, it was dated January
15, 2015, and was sent by a different attorney on Winakor's behalf.  Pl.'s R. 56(a)1 Stmt
at ¶ 6; Def.'s R. 56(a)2 Stmt at ¶ 6.  The letter detailed a litany of alleged deficiencies in
the work Savalle performed on Winakor's property; demanded reimbursement in the
amount of $97,000; and was explicit in saying that, if Savalle failed to pay that amount,
"suit will be commenced without further notice."  Def.'s Ex. H, Letter from Paul M.
Geraghty, Esq. to Vincent Savalle, Re: Lee Winakor, 217 Ledgenwood Road, Jan. 15,
2015 ("January 2015 Demand Letter") (Doc. No. 106-8) at 2.

Winakor was true to his word, and on June 3, 2015, Savalle was served with a
Summons and Complaint dated May 28, 2015, and filed by Winakor in Connecticut
Superior court.  Pl.'s R. 56(a)1 Stmt at ¶ 7; Def.'s R. 56(a)2 Stmt at ¶ 7.  The Complaint
asserted five counts against Savalle, all related to alleged deficiencies in the work he
had performed on Winakor's property.  Id.; see also Def.'s Ex. J, Complaint (Doc. No.
106-10).  Savalle then retained an attorney to defend him in the lawsuit.  Pl.'s R. 56(a)1
Stmt at ¶ 8; Def.'s R. 56(a)2 Stmt at ¶ 8.  At this point, neither he nor Davis had ever
contacted Main Street or Marcus about the firing, either of the demand letters, or the
actual lawsuit.

That changed on July 22, 2015, when Davis called Marcus to notify them of the
lawsuit approximately a month and a half after Savalle was served.  Def.'s Additional

Material Facts at ¶ 2.[4]  Davis testified that she spoke to a woman at Marcus who she did

not know, and that she was told that Savalle's "insurance [did] not cover that . . . [and

that] his insurance did not cover either unprofessional or faulty workmanship or contract

disputes."  Dep. of Teri Davis at 66-67.  Following this conversation, there is no

evidence in the record that Savalle, Davis, or anyone else on their behalf contacted

Marcus for the next two and a half years.  Def.'s Additional Material Facts at ¶ 4; Dep. of

Teri Davis at 67-70.

In the meantime, Winakor's lawsuit against Savalle progressed.  In January

2018, Davis again reached out to Marcus via email to inquire if Savalle's mounting

attorney's fees would be covered by his policy.[5]  Def.'s Additional Material Facts at ¶ 4;

Dep. of Teri Davis at 84.  Approximately a month later, at the end of February, the case

went to trial, lasting into early March.  Pl.'s R. 56(a)1 Stmt at ¶ 9; Def.'s R. 56(a)2 Stmt

at ¶ 9.  The trial court proceeded to issue a Memorandum of Decision on August 21,

2018 against Savalle, entering judgment against him in the amount of $100,173.32.

Pl.'s R. 56(a)1 Stmt at ¶ 10; Def.'s R. 56(a)2 Stmt at ¶ 10.

---

[4] Main Street objects to the admissibility of the Davis Affidavit, upon which Savalle bases paragraphs 2-4 of his Additional Material Facts section.  See Pl.'s Reply at 7 (arguing that it "objects to [the Davis] affidavit as it is self-serving, and cannot be used to create a genuine issue of material fact"). "Of course, simply because a statement is self-serving does not make it inadmissible."  Burns v. Rovella, No. 3:19-CV-553, 2021 WL 4263372, at *16 (D. Conn. Sept. 20, 2021) (citing Packer v. Raging Capital Management, LLC, 981 F.3d 148, 157 (2d Cir. 2020)).  Nor do the paragraphs of the Affidavit Savalle relies on in his Additional Material Facts section "include[ ] . . . information inconsistent with her prior deposition testimony", as Main Street contends.  Pl.'s Reply at 7.  Compare Def.'s Additional Material Facts at ¶¶ 2-3, with Dep. of Teri Davis at 63-67.  As such, the court deems the Davis Affidavit admitted.

[5] In her deposition, Davis testified that she "[could not] remember" whether or not she received a response to that email.  Dep. of Teri Davis at 84.  She also testified that she "must have and the answer must have been no because we never, you know, got any satisfaction from it."  Id. at 86.  However, she could not actually "recall the response", and neither her original email to Marcus in January 2018 nor their response – if one was indeed provided – are in the record.  Id.

In early August, following the trial but just prior to the court's decision, Davis again called Marcus and again was told that Savalle was not covered for any of Winakor's claims.  Aff. of Teri J. Davis at ¶ 10; Dep. of Teri Davis at 87-88.  After the decision was issued, she reached out to Marcus for a third time. Pl.'s Additional Material Facts at ¶ 4.  This time, the response was different.  Marcus "got interested and asked [Davis] to write details up."  Dep. of Teri Davis at 89.  She did so immediately, and emailed Marcus "a detailed synopsis", which the agent "told [her] he was going to forward [ ] to Main Street."  Id.  Marcus did so and, on September 4, 2018, Main Street itself received actual notice of the lawsuit and the claims brought by Winakor against Savalle for the first time.  Pl.'s R. 56(a)1 Stmt at ¶ 11; Def.'s R. 56(a)2 Stmt at ¶ 11; Def.'s Ex. G, Aff. of Brian J. Bennan (Doc. No. 106-7) at ¶ 5.

At no point before the state court judgment entered against Savalle did either he or Davis send either Marcus or Main Street a copy of the demand letters, Summons, or Complaint, as is required by the policy.  Pl.'s R. 56(a)1 Stmt at ¶¶ 12-15; Def.'s R. 56(a)2 Stmt at ¶¶ 12-15.  In her Affidavit, Davis averred that she first sent "the suit papers" to Marcus in her September 2018 email, although as Main Street points out, she also testified in her deposition that she had never provided "the October[ ] 2014 letter, the January 2015 letter or the summons and legal papers" to Marcus because "[t]hey never asked."[6]  Aff. of Teri J. Davis at ¶ 13; Def.'s R. 56(a)1 Stmt at ¶ 15 (citing

---

[6] The context of the question Davis was responding to in her deposition at page 93 does provide for the possibility that her response about not sending documents to Marcus was specific to her first call to them in 2015.  See Dep. of Teri Davis at 92-94.  Because this fact is disputed, the court for the purposes of this Motion construes it in the light most favorable to Savalle.

Dep. of Teri Davis at 93).  The September email in question has not been submitted for the record either.

After Main Street itself received actual notice of the lawsuit, it proceeded to "assign[ ] counsel to defend Savalle in the underlying action" as it was appealed, "subject to a reservation of rights to decline coverage."  Compl. at ¶ 20; Def.'s Answer at ¶ 20.  It also filed this action in December 2018, seeking a declaratory judgment that it is not obligated to defend or indemnify Savalle in the state court action because, inter alia, Savalle "failed to provide notice to [Main Street] as required by the [Main Street] Policy." Compl. at ¶ 40.

## III.    PROCEDURAL BACKGROUND

Main Street brings six counts against defendants Savalle and Winakor. Counts One and Three are brought against Savalle.  In those counts, Main Street alleges that the damages awarded to Winakor for his claims against Savalle in the state court lawsuit are not covered by Savalle's insurance policy.  Compl. at ¶¶ 24, 32.  It cites alternative provisions of the policy in each of these two counts, alleging that each is sufficient to find that Savalle is not covered for Winakor's claims.  Id. at ¶¶ 22, 26, 30, 35.  Counts Two and Four are brought against Winakor.  In those counts, Main Street alleges that, because of the policy provisions set forth in Counts One and Three, respectively, its policy "does not afford coverage with respect to the claims asserted by and damages awarded to Winakor."  Id. at 28, 37.

Main Street does not, however, actually move for summary judgment on any of these counts, despite its representation that its Motion addresses all of "its claims as set out in its First Amended Complaint."  Pl.'s Mot. for Summ. J. at 1.  Rather, the arguments in its Motion for Summary Judgment are entirely confined to the allegations it

makes in Counts Five and Six of the operative Complaint.  In Count Five, brought against Savalle, Main Street alleges that, because Savalle breached the policy by failing to provide notice to Main Street of Winakor's claims, the policy "does not afford coverage with respect to the claims asserted by and damages awarded to Winakor in the underlying action."  Compl. at ¶ 45.  Count Six is brought against Winakor, and alleges that, for the same reason, Main Street's policy does not cover the damages awarded to him in the state action.  Id. at ¶ 47.  Because Main Street has not set forth any arguments as to why summary judgment should be granted as to Counts One through Four, inclusive, the court interprets its Motion as applying to only Counts Five and Six.

## IV.   STANDARD OF REVIEW

A Motion for Summary Judgment will be granted if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986).  The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A genuine issue of material fact exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor.  See, e.g., Biondo v. Kaledia Health, 935 F.3d 68, 73 (2d Cir. 2019) (citing Anderson, 477 U.S. at 248)).

## V.   ANALYSIS

Defendant Savalle's insurance policy with Main Street requires him to notify them "as soon as practicable of an 'occurrence' or an offense which may result in a claim."

<u>See</u> Insurance Policy at 59, 186, 322, 460, 608.  It also requires, in the event that "a

claim or 'suit' is brought against [him]", that he "see to it that [Main Street] receive[s]

written notice of the claim or 'suit' as soon as practicable" and that he "[i]mmediately

send [Main Street] copies of any demands, notices, summonses or legal papers

received in connection with the claim or 'suit.'"  <u>Id.</u>

Main Street argues that Savalle violated these notice provisions multiple times,

and that, by reason of his breach of the policy, it is not obligated to defend or indemnify

him in the state court proceeding brought by Winakor.  More specifically, it argues that

Savalle breached the policy on four distinct occasions, each of which "alone is sufficient

to bar coverage because Main Street was prejudiced as a result of Savalle's

breaches."[7]  Pl.'s Mem. at 6.  First, it contends that Savalle should have notified Main

Street when he was fired by Winakor in April 2014 because that incident constituted "an

'occurrence' or offense which may result in a claim."  Insurance Policy at 59, 186, 322,

460, 608; Pl.'s Mem. at 10.  Second, it argues that the October 2014 demand letter

triggered Savalle's duty under the policy to both notify Main Street of a possible claim

and to send it a copy of the letter.  Pl.'s Mem. at 10-11.  It also argues that the January

2015 demand letter did the same.  Pl.'s Mem. at 10.  Fourth, Main Street contends that

Davis' call to Marcus in July 2015 just after the lawsuit was filed did not constitute notice

to Main Street and that even if it did Savalle still breached the policy by not immediately

sending copies of the Summons and Complaint.  Pl.'s Mem. at 13-14.  Finally, Main

---

[7] Main Street also states that Savalle breached the policy by "incurring expense without Main Street's consent related to defense of the Winakor suit."  Pl.'s Mem. at 6.  It does not actually make an argument in support of this statement throughout the course of its Memorandum, however, and as such the court does not address the issue.

Street avers that it was prejudiced by each of Savalle's failures to notify it about Winakor's claims.  Id. at 14-16.

Savalle counters by arguing that first, Marcus was Main Street's agent, and so when "Davis notified [Marcus] on his behalf" in July 2015, "he thereby notified [Main Street]."  Def.'s Mem. at 10.  He also contends that neither his firing in April 2014 nor the January 2015 demand letter constituted events that triggered the notice requirements because they would not have "[led] a reasonable person to conclude that a covered liability had been incurred."  Id. 9.  Finally, as noted at supra n. 3, Savalle argues that the best evidence rule precludes the introduction of testimonial evidence regarding the October 2014 letter, and as such whether its contents required Savalle to notify Main Street is an issue of disputed material fact.  Id. at 8-9.  He also argues that Main Street was not prejudiced by Savalle's failure to notify Marcus until Davis' July 2015 call.  Id. at 12-17.

The court addresses each of these events in turn.  Before doing so, it first examines how Connecticut courts have assessed notice requirements in insurance contracts.  Second, it analyzes the evidence in the record as it pertains to the possible agency relationship between Main Street and Marcus, concluding that the issue is one of disputed material fact.  Next, the court finds that whether or not Savalle's firing triggered the notice requirement in the policy is also an issue of disputed fact.  Fourth, it analyzes both the January 2015 demand letter and the commencement of the lawsuit against Savalle.  Here, the record is much more complete, and because the court finds that no reasonable juror could conclude that Savalle met the notification requirements in

the policy after each of these events and that Main Street was prejudiced by this failure, it grants the Motion for Summary Judgment on these grounds.[8]

A.    Notice Requirements in Insurance Policies

In Connecticut, an insurer's obligation to indemnify or defend an insured may be discharged pursuant to the notice provisions of a policy where there is: "(1) an unexcused, unreasonable delay in notification by the insured", that (2) "result[s] [in] material prejudice to the insurer." Arrowood Indem. Co. v. King, 304 Conn. 179, 198 (2012) (internal quotations and citations omitted). This "rule [is] based on the basic principle that contracts should be enforced as written, and that contracting parties are bound by the contractual provisions to which they have given their assent." Id. at 201 (internal quotations and citations omitted). Still, it is not rigidly applied, and the second prong of the test – material prejudice to the insurer – operates to ensure that that insured parties are "protect[ed] . . . from disproportionate forfeiture" when their failure to adhere to the strict terms of the notification requirement does not harm the insurer. Id. at 201-02 (internal quotations and citations omitted).

Notice provisions like the one in Savalle's policy that require "immediate" or "as soon as practicable" notification have been read by the Connecticut Supreme court to mean that the insured must provide notification:

> as soon as can reasonably be expected under the circumstances . . . . The duty to give notice does not arise unless and until facts develop which would suggest to a person of ordinary and reasonable prudence that liability may have been incurred, and is complied with if notice is given within a

---

[8] Because the court finds that the Motion is properly granted on these grounds, it does not reach the question of whether the October 2014 demand letter trigged any obligations on Savalle's behalf as well.

reasonable time after the situation so assumes an aspect suggestive of a possible claim for damages."

Arrowood, 304 Conn. at 199 (internal quotations and citations omitted); see also City of West Haven v. U.S. Fidelity & Guaranty Co., 174 Conn. 392, 397 (1978) ("policy provisions employing terms such as 'immediately' . . . are generally construed as requiring only that notice be given within a reasonable time, under the circumstances of the particular case").  "Circumstances may be such as to explain or excuse delay in giving notice and show it to be reasonable."  City of West Haven, 174 Conn. at 397 (internal quotations and citations omitted).  However, when the incident in question is "far from slight and [is] unmistakably apparent", notice must be provided.  Arrowood, 304 Conn. at 200.  This is in part because "the notice requirement turns not on an insured's subjective assessment of how likely a claim is to be brought, but rather on whether a reasonable person would recognize that liability may have been incurred."  Id. (internal quotations and citations omitted).

Still, even if an insured fails to meet the notification requirements in the policy, an insurer is only discharged of its obligations if it suffers material prejudice.  "If notice was untimely, a further determination of whether the insurer[ ] [was] prejudiced by the late notice [is] necessary."  Id. at 201.  "[T]he insurer bears the burden of proving, by a preponderance of the evidence, that it has been prejudiced by the insured's failure to comply with a notice provision."  Id.  Placing the burden of showing prejudice on the insurer "incentiviz[es] [them] to bring evidence of prejudice, should it exist, to the court's attention."  Id. at 203.  Prejudice is understood within the context of the benefits notice provisions are meant to provide to insurers; namely, the "'opportunity for a timely investigation" that could lead to "reasonable compromises and settlements . . . thereby

avoiding prolonged and unnecessary litigation.'" <u>Argonaut Ins. Co. v. Town of Berlin</u>,

No. CV126017084, 2014 WL 7497509, at *2 (Conn. Super. Ct. Dec. 1, 2014) (quoting

<u>Aetna Cas. and Sur. Co. v. Murphy</u>, 206 Conn. 409, 417 (1988), <u>overruled on other</u>

<u>grounds by Arrowood</u>, 304 Conn. 179).  In this regard, courts in Connecticut "consider

delay resulting in hindrance of investigation and defense of claims to be materially

prejudicial to insurers." <u>Id.</u> at *4.

      B.    <u>The Agency Relationship Between Main Street and Marcus</u>

      As an initial matter, the parties dispute whether Marcus is an agent of Main

Street, and therefore whether any notice to Marcus would constitute notice to Main

Street.  Neither party, however, has brought forth facts in the record to support their

claim.  In its initial Memorandum, Main Street says only that it "denies that notice to

[Marcus] constitutes notice to Main Street."  Pl.'s Mem. at 13.  It does not say why this is

the case.  Savalle, for his part, states in the Additional Material Facts section of his Rule

56(a)2 Statement that Marcus "is the plaintiff's agent."  Def.'s Additional Material Facts

at ¶ 1.  In support of this claim, however, he cites only to pages in the insurance

agreement where Marcus is described as an "agent."  <u>Id.</u> (citing, <u>e.g.</u>, Insurance Policy

at 4).  While this is indeed evidence that the Charles G. Marcus Agency, Inc. is an

insurance agent, the policy at no point says that Marcus is acting as an agent <u>of</u> Main

Street.  In his Memorandum, Savalle also points to treatise definitions of insurance

agents and brokers to bolster his claim.  "'Bluntly stated, an "insurance agent"

represents the company, whereas an "insurance broker" represents the insured,

although the question of whether one is an insurance agent or broker is a question

dependent of the particular facts.'"  Def.'s Mem. at 10 (quoting 16 Appleman, Insurance

Law and Practice § 8725 (1981)).  Other than the fact that Marcus' full business name

14

includes the word "agency", Savalle identifies zero "particular facts" evincing an agency relationship between Main Street and Marcus, nor does he cite even a single case in support of his agency argument.  See Beckenstein v. Potter and Carrier, Inc., 191 Conn. 120, 133-34 (1983 ("the labels used by the parties in referring to their relationship are not determinative").  Main Street fares no better in its Reply, stating again in a conclusory manner that "Savalle and Davis picked [Marcus] as their agent, and they provided the agent with their information.  The agent the provided them with options for insurance through various carriers.  [Marcus] served as the Defendant's agent rather than the Plaintiff's."  Pl.'s Reply at 5 (internal citations omitted).  The pages of Davis' deposition that Main Street cites in support of its argument include passages where Davis says only that a Marcus agent came to their house, asked questions about Savalle's work, and provided them with policies that Savalle signed.  Id. (citing Dep. of Teri Davis at 62:21-63:4).

In Connecticut, "[t]he existence of an agency relationship is a question of fact." Wesley v. Schaller Subaru, Inc., 277 Conn. 526, 543 (2006) (internal quotations and citations omitted).  "The relationship may be established through evidence of actual authority, which may be express or implied, or through evidence of apparent authority based on the conduct, in both instances, of the principal."  Jimdee, LLC v. Flanagan Assocs., No. CV095030686S, 2010 WL 5610889, at *2 (Conn. Super. Ct. Dec. 17, 2010).  Although Savalle cites no case law in support of his agency argument, he appears to rely on a theory of apparent agency to contend that Davis' call to Marcus constituted notification to Main Street.  "[T]he doctrine of apparent agency . . . creates an agency relationship that would not otherwise exist."  Cefaratti v. Aranow, 321 Conn.

15

593, 600 (2016). "[A]pparent agency arises when a principal, through his own acts or inadvertences, creates a semblance of authority in the apparent agent that causes or allows a third person to believe the agent possesses such authority." TD Properties, LLC v. VP Bldgs., Inc., 602 F. Supp. 2d 351, 360 n.7 (D. Conn. 2009). "The issue of apparent authority" – i.e., the authority of the apparent agent to bind the principal – is similarly "determined based on two criteria." Tomlinson v. Board of Educ. of City of Bristol, 226 Conn. 704, 734 (1993); Cefaratti, 321 Conn. at 600. "First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority." Tomlinson, 226 Conn. at 734 (internal quotations and citations omitted). "Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action. Id. at 734-35 (internal quotations and citations omitted). In this way, "apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal." Id. at 734.

Here, the court concludes that whether Marcus was an agent of Main Street is an issue of disputed fact. As discussed above, the parties have brought forth minimal evidence on this issue. However, the evidence that is in the record, when viewed in the light most favorable to Savalle, could allow a reasonable jury to conclude that an agency relationship between Main Street and Marcus did indeed exist. First, although mere labels are not determinative in this context, Connecticut courts have used the distinction between insurance agents and insurance brokers as probative of an agency relationship or lack thereof in deciding motions for summary judgment. See, e.g.,

Jimdee, 2010 WL 5610889, at *3.  Second, and more importantly, in the insurance policy itself, Main Street has provided indications that reaching out to Marcus was exactly what Savalle was supposed to do if he was unsure how to proceed under the terms of the policy.  The most glaring of these is an explicit instruction from Main Street to the insured that, "[i]f you have any questions regarding your insurance policy, please contact your independent agent."  Insurance Policy at 119.  Moreover, the policy does not appear to specify how Savalle would direct notice or required documents to Main Street to inform it of a possible claim.  These details are left deceptively vague. Although the address of Main Street's corporate headquarters is listed on page 2 of the policy and Savalle is also provided with an address from which he can request a copy of Main Street's privacy policy, it does not appear that the policy itself specifies how Savalle is supposed to contact Main Street about a potential claim.  Insurance Policy at 2, 120.  In contrast, Marcus' name, address, and telephone number are prominently featured at the top of the policy.  Id. at 4.  To be sure, none of these observations abrogate Savalle's contractual obligations under the policy; they do, however, present an issue of triable fact as to whether Main Street's actions or inadvertences "create[d] a semblance of authority in [Marcus] that cause[d] or allow[ed] [Savalle] to believe" that Marcus was an agent of Main Street.  TD Properties, 602 F. Supp. 2d at 360 n.7.  Given Main Street's clear instruction that Savalle should reach out to Marcus if he had "questions regarding [his] insurance policy;" Marcus' status as an insurance agent rather than a broker; and the lack detail about how Savalle was supposed to contact Main Street as compared to the readily-available contact information for Marcus in the policy, a reasonable juror could conclude that Main Street's conduct held Marcus out as

having the authority to be contacted on its behalf, and that Savalle relied on that representation in good faith.

    C.    <u>Savalle's Firing in April 2014</u>

Main Street next argues that when Savalle was fired by Winakor in April 2014, that event triggered Savalle's duty under the policy to "notif[y] Main Street as soon as practicable of an 'occurrence' or an offense which may result in a claim." Insurance Policy at 59, 186, 322, 460, 608. Here, the court again concludes that whether or not Savalle's firing triggered his notification responsibilities under the policy is a matter of disputed fact.

In its Rule 56(a)1 Statement, Main Street states that Savalle was fired by Winakor after being informed that his work was unsatisfactory. As Savalle points out, however, the evidence in the record that Main Street cites to in support of the claim that Savalle knew of the reasons he was fired is threadbare, and does not necessarily "suggest to a person of ordinary and reasonable prudence that liability may have been incurred." <u>Arrowood</u>, 304 Conn. at 199 (internal quotations and citations omitted). For instance, although Davis testified that Savalle had accidently broken through Winakor's septic tank, she also testified that he had "replaced that tank at his own expense and temporarily hooked it up." Dep. of Teri Davis at 49. And even though "he got fired" shortly thereafter, he told Winkor that the tank "has to stay open until it is inspected again." <u>Id.</u> In other words, although Savalle had certainly broke through to the septic tank, "he replaced it" at his own expense prior to being fired and "was temporarily hooking it up so that they would be able to use it" when he was let go. <u>Id.</u> The tank, according to Davis, was replaced "within days. It may have even been the next day." <u>Id.</u> at 49-50. She also testified that, before that incident, there were never any other

concerns or complaints from Winakor about Savalle's work, and that she was not aware of any other concerns or complaints until receiving the October 2014 demand letter. <u>Id.</u> at 50-51.

Similarly, Savalle testified that, in April 2014, he "was told to leave the property" after he had "put the new tank in." Dep. of Vincent Savalle at 34. Savalle then told Winakor he would have to have the new tank inspected, to which Winakor's father responded that he was a "licensed installer" and that he would "take care of the inspections." <u>Id.</u> at 34-35. To be sure, Savalle also testified that Winakor had communicated concerns to him regarding his work previously, and that such communication went on "continuously . . . throughout the whole job." <u>Id.</u> at 36, 39-40. But those concerns had to do primarily with what Savalle says was Winakor's desire to take down trees without a permit on wetlands, along with other disputes related to the work he was to perform on the house. <u>Id.</u> Thus, when Savalle was fired, his interpretation was that it was "[b]ecause [he] wouldn't go out in the wetlands" or work on property that was not Winakor's. <u>Id.</u> at 44-45.

Nor did Winakor testify that he made Savalle fully aware of the scope of his concerns before firing him. Though his "initial concerns" with the work were that it was "taking way too long", he said he spoke with other "people" – not Savalle – who told him "it shouldn't be going this way." Dep. of Lee Winakor at 20. Winakor also testified that his "first major concern" with Savalle's work was "when he crushed the first septic tank" – the same tank that Savalle then replaced at his own expense before being fired. <u>Id.</u> at 21. "It wasn't until afterwards" that Winakor "started to uncover a lot of problems" and "had some serious concerns. <u>Id.</u> at 20-21.

Taken together, the evidence in the record could permit a jury to conclude that, at the time Savalle was fired, a "reasonable person" standing in his shoes "would [not have] recognize[d] that liability may have been incurred." Arrowood, 304 Conn. at 200 (internal quotations and citations omitted). The event that precipitated his firing was the crushed septic tank – an issue that Savalle believed he had fixed before he left by replacing the tank and temporarily hooking it up. Given that he had arguably repaired the damage he had caused and Winakor's father had told him that he would take care of the inspection, a reasonable jury could conclude that the notice requirement had not been triggered. See, e.g., id. at 199-200 (citing Baker v. Metro. Casualty Ins. Co., 118 Conn. 147, 153-54 (1934), where the court held that the "reasonableness of delayed disclosure is [a] question of fact when [a] child struck by [a] car displayed no injuries and [the] child's mother informed [the] driver that [the] child was not injured").

Accordingly, the court denies Main Street's Motion for Summary Judgment as to its argument that Savalle breached the policy by failing to provide notice in April 2014 after he was fired by Winakor.

     D.    The January 2015 Demand Letter and the Lawsuit

        1.    Failure to Meet the Notification Requirements

Finally, Main Street contends that the January 2015 demand letter and Savalle being served with the Summons and Complaint in June 2015 both constituted events that triggered the notice requirement in the policy, in particular the requirement that notice be in writing and that Savalle send copies of those documents to Main Street. Pl.'s Mem. at 10-13. Savalle counters by arguing that "an objective reading of the [January] letter would [not] lead a reasonable person to believe that a liability might arise that was covered by the policy", and that "when Davis notified [Marcus]", it

constituted notice on Savalle's behalf to Main Street.  Def.'s Mem. at 9-10.  The court agrees with Main Street here on both contentions, and concludes that Savalle has not met his burden of coming forward with material issues of fact upon which a reasonable juror could conclude to the contrary.

After receiving the January 2015 demand letter – the second he had received from Winakor – Savalle did nothing to alert either Main Street or Marcus, let alone provide them written notice and a copy of the demand.  He concedes this much.  Id. at 9.  He also concedes that the policy required him, in the event that "a claim [was] made or [a] 'suit' [was] brought against [him]", to "see to it that [Main Street] receive[d] written notice of the claim" and that he "[i]mmediately send [Main Street] copies of any demands."  Pl.'s R. 56(a)1 Stmt at ¶ 2; Def.'s R. 56(a)2 Stmt at ¶ 2.  Although the policy itself does not define "claim", the plain meaning of the term is evident: Black's Law Dictionary defines it in this context as "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional."  Claim, Black's Law Dictionary (11th ed. 2019).  And it is beyond question that the January 2015 letter asserted a claim against Savalle.  Indeed, the letter explicitly stated that "[d]emand is hereby made to reimbursement of the $97,000 incurred by my client to complete or correct the work which was your responsibility", and that should Savalle fail to meet that demand "suit will be commenced without further notice."  Def.'s Ex. H at 2.

In the face of these facts, Savalle argues that he was not required to notify Main Street of the letter because it "claimed breach of contract, a violation of the Home Improvement Act, and deficient workmanship, none of which are 'occurrences' within the meaning of the policy and some of which are explicitly excluded from coverage."

21

Def.'s Mem. at 9.  This argument fails for the simple reason that, even if Savalle is

correct that the letter did not constitute an "occurrence" as defined in the policy, he

declines to recognize that his written notification obligations apply to "claim[s]" or "suit[s]

. . . brought against [him]" as well.[9]  The January 2015 demand letter plainly asserted a

claim against Savalle: not only did it assert that Winakor was entitled to damages based

on Savalle's work, but it even provided a precise dollar figure as to how much Winakor

believed he was owed and made clear his intention to sue if his demands were not met.

As such, Savalle was required to send Main Street written notice of that claim along with

the demand letter within a reasonable time.  Because he did not do so, the court holds

that no reasonable juror could conclude that Savalle was not in breach of his obligations

under the policy with respect to the requirement to notify Main Street after receiving the

January 2015 demand letter.

The court concludes the same as it relates to Savalle's obligations after receiving

the Summons and Complaint in June 2015.  Savalle argues that, when Davis called

Marcus in July 2015, he fulfilled the notification requirements in the policy.[10]  Def.'s

---

[9] Savalle is also obligated to notify Main Street of "an offense which <u>may</u> result in a claim", but there is no requirement in that instance that the notice be in writing.  <u>See</u> Insurance Policy at 59, 186, 322, 460, 608 (emphasis added).

[10] Somewhat curiously, Savalle argues only that Davis' call to Marcus was sufficient to meet the notification requirements in the policy.  Def.'s Mem. at 9-11.  He does not assert an equitable estoppel defense, or argue that Marcus' representation that he was not covered for the claims brought by Winakor should preclude Main Street from seeking to enforce the notice provisions in the policy.  In other words, Savalle believes Davis' call to Marcus was enough; he does not argue that, even if it was not, Main Street should be equitably estopped from asserting its rights to written notification because its agent, Marcus, represented to Savalle that Winakor's claims would not be covered.

Here, summary judgment would still be appropriate in the face of an estoppel defense for two reasons.  First, even a successful estoppel argument would only obviate Savalle's duty to notify after Davis called Marcus in July 2015.  He would still have breached the policy by failing to notify Main Street after receiving the January 2015 demand letter, a breach which resulted in material prejudice.  That alone is sufficient to grant summary judgment.  Moreover, Main Street "was under no duty" to inform Savalle of his responsibilities under the policy, "or to further inform him of its intentions to rely on the [notification]

Mem. at 9-12.  Even if a jury were to conclude that Marcus was Main Street's agent – as a reasonable jury could find, see supra Section V.B – Savalle would still, as a matter of law, fall short of meeting his obligations under the policy.

In Connecticut, "[a]n insured is required to provide notice of a claim against it in the manner in which the policy requires."  Ellis v. County Agency, Inc., No. CV146017155S, 2017 WL 1238457, at *2 (Conn. Super. Ct. Jan. 23, 2017) ("Ellis I"), aff'd on reh'g, Ellis v. County Agency, Inc., No. CV146017155S, 2017 WL 3011674 (Conn. Super. Ct. May 25, 2017) ("Ellis II") (citing Arrowood, 304 Conn. at 201). Although "any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy", where "the terms of the policy are clear and unambiguous, then the language . . . must be accorded its natural and ordinary meaning."  Johnson v. Conn. Ins. Guar. Ass'n, 302 Conn. 639, 643 (2011).  In circumstances where the insured "was required to provide written notice and forward the suit papers" to the insurer, but the insured only "call[s] the insurance agent", there "is not a material issue of fact that precludes summary disposition because, even in light of that evidence, the policy clearly provides that written notice must be given."  Ellis II, 2017 WL 3011674, at *3; see also Dorchinsky v. Windsor Ins. Co., 90 Conn.

---

provision as a defense to coverage."  Boyce v. Allstate Ins. Co., 236 Conn. 375, 387 (1996).  That, coupled with Savalle's failure to bring any facts into the record to indicate that he altered his position based on Marcus' representations, would be fatal to his estoppel claim.  See Glazer v. Dress Barn, Inc., 274 Conn. 33, 60 (2005) ("there are two essential elements to an estoppel – the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done").  Davis testified that she did not send any of the legal papers to Main Street because "[t]hey never asked."  Aff. of Teri J. Davis at ¶ 13; Def.'s R. 56(a)1 Stmt at ¶ 15 (citing Dep. of Teri Davis at 93).  There are no facts that Savalle has pointed to in the record upon which a reasonable jury could conclude that he intended to meet the notification requirements in the policy, but then changed his position and decided not in reliance on Marcus' representations.

App. 557, 560-61 (2005) (when insured telephoned her insurance agent immediately after an accident and even provided further documentation to the agent, but the "policy plainly require[d] written notice of a claim", then "no genuine issue of facts exists" and summary judgment for the insurer is warranted).

Accordingly, the court concludes that, based on the evidence in the record, no reasonable juror could conclude that Savalle was not in breach of the policy by failing to provide written notice of the January 2015 demand letter and subsequent lawsuit, and by failing to send those documents to Main Street within a reasonable time thereafter.

>	2.	Prejudice

Even with Savalle in breach of the notification requirements in the policy, Main Street must still meet its burden of showing material prejudice before its duties under the policy are discharged.  An insurer can be prejudiced "by being deprived of the opportunity to pursue a compromise or settlement", which is in the interests of both the insurer and the insured because it allows for the parties to "'avoid[ ] prolonged and unnecessary litigation.'"  Hartford Ins. Co. v. Colonia Ins. Co., 58 Conn. App. 39, 44 (2000) (quoting Aetna Cas. and Sur. Co. v. Murphy, 206 Conn. 409, 417 (1988)).[11] Main Street, relying on an Affidavit from Brian J. Brennan, a claims manager in the company, argues that it was prejudiced in two discrete ways.  First, Savalle's failure to notify it about the January 2015 letter meant that "it was denied the opportunity to timely

---

[11] Although Arrowood explicitly overruled Aetna "to the extent that it allocated the burden to the insured to disprove prejudice" in favor of a rule "that the insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision", it did not disturb the case law on what, substantively, actually constitutes prejudice to an insurer.  Arrowood, 304 Conn. at 725-26.  In that sense, pre-Arrowood case law defining prejudice is still relevant here, even if the burden is now on Main Street to demonstrate that it was prejudiced by Savalle's breach of the notice provisions in the policy.

investigate the claims pre-suit."  Pl.'s Reply at 7.  Second, once the lawsuit was filed

and Savalle failed to provide written notice and a copy of the Summons and Complaint,

it was prejudiced by Savalle's insufficient notice because it was precluded from

"issu[ing] a reservation of rights, defend[ing] the case from the beginning, and . . .

control[ing] the defense throughout the course of litigation, including [by] conducting

discovery, hiring experts and controlling the arguments presented at trial.  Id. at 7-8.

Crucially, upon first receiving actual notice of the lawsuit in September 2018, Main

Street did indeed "assign[ ] counsel to defend Savalle in the underlying action" as it was

appealed, "subject to a reservation of rights to decline coverage."  Compl. at ¶ 20; Def.'s

Answer at ¶ 20.

Savalle does not counter by pointing to evidence in the record contradicting

these affirmations; rather, he argues that all of Main Street's "claim[s] of prejudice [are]

premised on the assertion that Savalle first provided notice to Main Street" in

September 2018, "an assertion Savalle has disputed since the beginning of this case."

Def.'s Mem. at 16.  As for the claim of prejudice related to the January 2015 letter, he

argues that Main Street does not show how its investigation "would have improved on

that of Savalle's private counsel."  Id. at 17.

These arguments, however, both miss the mark.  Generally, one purpose of a

demand letter is to notify the recipient of the sender's legal claim and encourage pre-

suit settlement instead of litigation.  See, e.g., Charger Services, LLC v. Togs USA, Inc.,

No. 19-CV-00058, 2019 WL 11519056, at *1 (W.D. Tex. Apr. 10, 2019).  It is for this

very reason that Savalle's policy required him to "immediately send [Main Street a] copy

of the demand[ ]" when it was received.  Insurance Policy at 59, 186, 322, 460, 608.  By

not doing so, Savalle prevented Main Street from beginning its investigation of the claim and potentially engaging in settlement discussions before Winakor's suit was filed.  Nor is Main Street required, as Savalle contends, to prove the counterfactual that its attorneys could have performed better than his during this period.  See, e.g., Jazlowiecki v. Nationwide Ins. Co. of Am., No. HHDCV126036618S, 2014 WL 4746527, at *5 (Conn. Super. Ct. Aug. 8, 2014) (rejecting plaintiff's claim that defendant suffered no prejudice because he was represented by counsel and, upon notifying the insurer, his counsel debriefed their attorneys on the litigation).  This is because "being deprived of the opportunity to pursue a settlement or compromise" is itself an "example[ ] of prejudice."  Ellis I, 2017 WL 1238457, at *2; see also Hartford, 58 Conn. App. at 44 (insurer "prejudiced by being deprived of the opportunity to pursue a compromise or settlement").  This is especially true when the delay in receiving actual notice is greater than three years, and the insurer's conduct after receiving actual notice of the claim is to quickly issue a reservation of rights and assign counsel to defend the insured.

This prejudice was only compounded by Savalle's later breach when he failed to provide Main Street with written notice of the lawsuit and forward it a copy of the Summons and Complaint.  Provisions in insurance contracts specifying that notice must be written and accompanied by copies of relevant legal documents – as opposed to provided orally over the phone – are essential in that they optimize "the [insurer's] ability to determine whether coverage applie[s] and to prevent loss . . . to the [insured]."  Chicago Title Ins. Co. v. Bristol Heights Associates, LLC, 142 Conn. App. 390, 409 (2013).  In this way, the manner of notice is no mere technicality; rather, it protects the

capacity of the insurer to access all information related to a potential claim, and act accordingly to protect both it and the insured's interests in a timely fashion.

Savalle's failure to adhere to these provisions meant that Main Street was denied "its right to be involved in and control the defense" in the underlying suit.  Pl.'s Reply at 8.  According to Davis, Main Street was not provided with the "suit papers" until September 2018, months after the trial and shortly after the judgment against Savalle had been entered.  Aff. of Teri J. Davis at ¶ 13.  When this is the case, and the insurer has been denied the opportunity to participate in the litigation until after the case has gone to trial, it is manifest that the insurer has been materially prejudiced.  See, e.g., Jazlowiecki, 2014 WL 4746527, at *6 (finding prejudice when notice was delayed ten months and given "on the eve of trial").

Accordingly, the court finds that no reasonable juror could conclude that Main Street was not materially prejudiced by Savalle's failure to notify it in accordance with the terms of the policy after the January 2015 demand letter and the start of the lawsuit. It therefore grants the Motion for Summary Judgment as to Main Street's argument that it is entitled to judgment as a matter of law because Savalle breached the policy in these two instances and those breaches materially prejudiced Main Street.

## VI.     CONCLUSION

For the reasons discussed above, the court grants Main Street's Motion for Summary Judgment as to Counts Five and Six of its Complaint, and as to Savalle's counterclaim.  Granting this Motion resolves the issue of whether Main Street is obligated to defend or indemnify Savalle in the state court case brought by Winakor. Because Counts One, Two, Three, and Four seek this same relief on alternative grounds, the court intends to dismiss them as moot, in light of this Ruling, as they no

longer present a case or controversy.  If any party opposes the dismissal of Counts One

through Four, inclusive, on these grounds, they are ordered to show cause within

fourteen (14) days of the date of this Ruling as to why those Counts are not moot.


**SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of January 2022.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge